[Civ. No. 24278.   First Dist., Div. Two.   Mar. 27, 1967.]

THE PEOPLE, Petitioner, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent; CLAUDE W. KING, Real Party in Interest.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Charles W. Rumph, Deputy Attorney General, for Petitioner.

No appearances on behalf of Respondent or Real Party in Interest.

AGEE, Acting P. J.—The People seek a writ of mandate directing the respondent superior court to set aside its order dismissing a criminal action against real party in interest (''King'') and to proceed with the trial of said action.

The information charged King with felony manslaughter (Pen. Code, § 192). He entered a plea of not guilty. Before the commencement of any trial thereof, the court dismissed the action on its own motion under the provisions of Penal Code section 1385.

This section provides in pertinent part: "The court may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

■ An order made by the superior court under this section is nonappealable (*People* v. *Valenti*, 49 Cal.2d 199 [316 P.2d 633]) and the proper remedy to set aside such an order is mandamus. (*People* v. *Superior Court*, 202 Cal.App.2d 850 [21 Cal.Rptr. 178].)

In dismissing the action, the trial judge relied entirely upon the transcript of the evidence adduced at the preliminary hearing. There was nothing else before him. Four witnesses testified at the hearing. A summary of their testimony follows.

King's sister testified that on August 30, 1966, about 10 p.m., she and her brother were at their residence; that her fiancé was also there; that she heard a loud noise outside and King said that "somebody was stripping his car"; King went outside; she heard him yell, then heard shots, "more than one"; the shots came immediately after the yell; she looked through the window and saw two boys running; one fell as he turned the corner; it looked like he slipped; right afterward King returned to the house and called the police; King remained in the house until the police came.

Police Sergeant Summerlin of the San Francisco Housing Authority testified that he saw King about 10:40 p.m. on the night in question; that King was looking at a Mercury sedan, parked on Oakdale Street; that the person who was shot was lying face down across the street; in answer to Summerlin's questions,[1] King stated he was the owner of the Mercury, that the person lying down was one of those stripping his car, and that he (King) had shot him; that the gun was in his sister's apartment; that he (Summerlin) went to the apartment and the fiancé handed him the gun; that the fiancé took it from a stand in the bedroom; that it was an automatic; that he turned the gun over to the criminologist.

---

[1]Since King makes no objection to any of Summerlin's testimony, it is unnecessary to discuss the possible applicability of the exclusionary rule laid down in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (*People* v. *Larke*, 246 Cal.App.2d 571 [54 Cal.Rptr. 834].)

The autopsy surgeon testified that the cause of death was a gunshot wound of the aorta; that a bullet was recovered from the subcutaneous tissues over the front of the chest; that it had entered the body at the back of the chest.

A criminologist from the San Francisco Police Department testified that King's gun fired the bullet found in the body of the deceased.

On December 5, 1966 the matter was on the calendar of respondent court, at which time the following colloquy took place: "THE COURT: Doesn't this add up almost as a matter of law to using force necessary to prevent the commission of a felony? MR. MAURER [prosecutor]: I don't know that much about it at this time, to state that categorically. THE COURT: I don't think any fine line should be drawn in a situation like this. Certainly there was no felonious intent on the part of this defendant, even though he might have been a little bit quick to pull the trigger. . . . If I get the picture, I think that if this matter were submitted on the [preliminary hearing] transcript, I would find the defendant not guilty. Do you want to put it over to tomorrow and take another look at the transcript? MR. MAURER: Yes."

On the following day the judge advised counsel as follows: "I think I indicated [yesterday] that if this matter were submitted on the [preliminary hearing] transcript I would find the defendant not guilty. . . . Well, to have it submitted to the court for decision requires of course a stipulation, an agreement of both parties and waiver of a jury. If a jury is waived, that would be my determination of the case. If it is not waived, it will have to be tried." Defense counsel immediately agreed to the waiver and submission.

The prosecutor was thus faced with a predetermined acquittal if he joined in the agreement. He nevertheless did not move to disqualify the judge. (See Code Civ. Proc., § 170, subd. 5, § 170.6; *People* v. *Gonzales,* 235 Cal.App.2d Supp. 887, 891 [46 Cal.Rptr. 301]; *People* v. *Winters,* 171 Cal.App. 2d Supp. 876, 888 [342 P.2d 538].) Instead, the prosecutor apparently relied upon the judge's statement that the case "will have to be tried [*by a jury*]" if he (the prosecutor) did not agree to waive a jury.

The prosecutor therefore advised the court as follows: "I can't join in that, your Honor. We will have to try it." The judge then commented briefly on some of the testimony at the preliminary hearing and summarized as follows: "We have a situation where this defendant owned an automobile

and he finds 3 men stripping his car; and he goes out and attempts to preserve his rights and shoots one of them.''

Thereupon, without any prior indication that he was even considering a *dismissal* of the action, the judge stated: ''So under the provisions of section 1385 the court now on its own motion and in furtherance of justice orders this action to be dismissed.''

Section 1385 requires that ''The reasons of the dismissal must be set forth in an order upon the minutes.'' In lieu of strict compliance with this provision the judge ordered that the proceedings before him be transcribed and filed. The only reason appearing in such transcript is that set forth above verbatim.

The People's case is based upon that portion of the law of manslaughter which defines involuntary manslaughter as the ''killing of a human being, without malice . . . in the commission of a lawful act which might produce death . . . without due caution and circumspection.'' (Pen. Code, § 192, subd. 2.) (Apparently the People interpret the firing of the shots as a ''lawful act,'' in that it was an attempt by King to frighten off the car strippers.)

Whether King used ''due caution and circumspection'' in the commission of such act is a question of fact. There is no *evidence* in the record *at the present time* which would support a finding that he did so act. At the very least, it is a disputable issue which is subject to trial by lawful procedure.

The judge indicated that he thought that the homicide was justifiable because committed by King in defense of his property.

Homicide by a private person is justifiable ''[w]hen committed in defense of habitation, *property,* or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a *felony,* or . . . [w]hen necessarily committed in attempting, by lawful ways and means, to apprehend any person for any *felony* committed . . . .'' (Pen. Code, § 197, subds. 2 and 4, respectively; italics added.)

The fallacy of such thinking is that the evidence before the court shows nothing more than ''car stripping,'' a *misdemeanor.* (Veh. Code, §§ 10852,[2] 40000. subd. (a).)

King's counsel made some *comments* that indicated a theory of excusable homicide. A homicide is excusable ''When com-

[2]This section provides in part that ''No person shall either individually or in association with one or more other persons, wilfully . . . remove any part of a vehicle without the consent of the owner.''

mitted by accident and misfortune, . . . in doing any . . . lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." (Pen. Code, § 195, subd. 1.)

Again we say, there is no evidence in the record before the trial judge that would support a finding of either justifiable or excusable homicide.

We come now to the single issue: *On the record then before him,* did the trial judge exercise the power of dismissal given to him by Penal Code section 1385 with legal discretion?

■ The "furtherance of justice" objective sought by the statute includes justice to society (the "People") as well as to the defendant. (*People* v. *Gonzales, supra,* at p. 890.) We need not labor this point.

Section 1385 was enacted in 1872 and has not been materially amended since. Our review of the appellate decisions involving dismissals under this section indicates that the trial judge seldom acts thereunder *on his own motion.* Such dismissals are generally ordered only "upon the application of the prosecuting attorney," as provided for in the section.

The reluctance of a trial judge to act *sua sponte* is understandable. He has other ways of protecting the rights of a defendant without depriving the People of the right to a trial of a charge duly presented in accordance with legal procedure. A trial judge may comment to the jury on the evidence (Cal. Const., art. VI, § 19), he may advise the jury to acquit (Pen. Code, § 1118), and, in the event of a conviction, he may grant a new trial on the insufficiency of the evidence. (Pen. Code, § 1181, subd. 6.)

Under the adversary nature of our criminal procedure, the prosecuting attorney, as the People's representative, is often in a position to make application for a dismissal "in furtherance. of justice" when the record *then before the trial judge* would not justify a dismissal by the judge on his own motion.

■ We hold that under the circumstances before him, the trial judge exceeded the bounds of judicial discretion in ordering the dismissal under section 1385. (See *State Farm etc. Ins. Co.* v. *Superior Court,* 47 Cal.2d 428, 432 [304 P.2d 13].)

Let a peremptory writ of mandate issue directing the trial court to set aside its order of dismissal and proceed as provided by law.

Taylor, J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.